## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BRIAN C. BROOK<br>465 Washington Blvd.<br>Apt. 4701S<br>Jersey City, NJ 07310 | ) ) ) ) ) ) ) | |
| and | ) | |
| MATTHEW J. PEED,<br>1840 Peabody Drive<br>Falls Church, VA 22043 | ) ) ) ) | |
| Plaintiffs,<br>v. | ) ) ) ) | Civil Action 1:17-cv-1207<br><br>**COMPLAINT AND JURY DEMAND** |
| BRADLEY D. SIMON<br>551 Fifth Avenue<br>31st Floor<br>New York, NY 10176 | ) ) ) ) ) | |
| and | ) ) | |
| SIMON & PARTNERS, LLP,<br>551 Fifth Avenue<br>31st Floor<br>New York, NY 10176 | ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiffs, Brian C. Brook and Matthew J. Peed, by way of Complaint against

the Defendants, Bradley D. Simon and Simon & Partners, LLP, say the following:

### NATURE OF THE ACTION

1.     Plaintiffs are attorneys who were associated with Simon & Partners,

LLP in 2011 and 2012. They worked there primarily on a case that one of the

Plaintiffs, Brian Brook, brought with him from his previous employer. Brook managed the case and was lead counsel of record.

2.     As detailed below, Simon & Partners' sole equity partner, Bradley D. Simon, misrepresented and concealed material facts from Plaintiffs—including their compensation, future prospects at the firm, and even the firm's underlying structure—to induce them to join and remain at the Firm. By doing so, Defendants have wrongly obtained over $700,000 in profits that Plaintiffs generated through their legal work.

3.     Allowing Defendants to continue to retain these profits would constitute unjust enrichment or, alternatively, violate their contractual rights.

## PARTIES

4.     Plaintiff Brian C. Brook is an attorney practicing law in New York, New Jersey and Washington, DC with the law firm Clinton Brook & Peed. Brook graduated from Duke University School of Law in 2005 and then worked as a litigation associate with Sullivan & Cromwell LLP in New York City. He became a member of the New York State Bar in 2006. In 2007, he left Sullivan & Cromwell for a one-year judicial clerkship. In 2008, he re-entered private practice as a litigation associate with Greenberg Traurig LLP in New York City, where he remained employed through June 2011.

5.     Plaintiff Matthew J. Peed is an attorney practicing law in Washington, D.C. with the law firm Clinton Brook & Peed.  Peed graduated from Harvard University in 2000 and worked in a variety of public service and charitable jobs before attending law school at Duke University School of Law, from which he

graduated in 2005.   After a one-year judicial clerkship, Peed joined Williams &

Connolly in Washington D.C. as an associate in 2006. In 2010, he left Williams &

Connolly and formed the law firm Clinton & Peed, PLLC with Timothy Clinton.

6.     Defendant Bradley D. Simon ("Simon") is an attorney licensed to

practice in New York and also a resident of New York. In or about 1998, Simon

entered into private practice as a solo practitioner in New York City. Some years

later, he began to work with other attorneys in his practice.

7.     Simon & Partners, LLP ("Simon & Partners" or "the Firm") is

purportedly a Limited Liability Partnership registered in the state of New York,

with a registered address of 30 Rockefeller Plaza, 42nd Floor, New York, New York

10112. The Firm's primary business is the practice of law with offices in the French

Building, 551 Fifth Avenue, 31st Floor, New York, New York 10176. The Firm also

maintains an office at 1750 K Street N.W., Washington, DC 20006. Upon

information and belief, Simon is currently the Firm's sole equity partner.

## JURISDICTION AND VENUE

8.     This Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs

are currently domiciled in New Jersey and Virginia, while Defendants are domiciled

in New York; and the amount in controversy exceeds $75,000.

9.     The Court has personal jurisdiction over Defendants because, among

other reasons, Simon & Partners maintains an office in the District of Columbia

and Simon is an active member of the District of Columbia bar.

10.     Venue in this District is appropriate under 28 U.S.C. § 1391(b)(1) because Simon & Partners, LLP is a resident of the District of Columbia by virtue of its maintaining and publicly advertising a place of business in the District.  In addition, venue is appropriate under 28 U.S.C. § 1391(b)(2) based upon the substantial events occurring within the District, as detailed below.

## FACTS COMMON TO ALL COUNTS

11.     In June 2011, Simon & Partners included three "Partners," two "Associates," and several "Of Counsel."

12.     The Partners and Associates were full time attorneys based in the New York office.

13.     Of Counsel were not employees of the Firm and did not work on the same cases as the Partners and Associates. Some of the Of Counsel practiced primarily outside of New York, including one in Washington, D.C.

14.     The other two "Partners" besides Simon—Brian D. Waller and Kenneth C. "Casey" Murphy—were not actually "partners" but instead were merely employees. For instance, at tax time they received forms W-2 rather than forms K-1. In addition, neither had any management authority over the Firm.

### The Executive Matter

15.     While at Greenberg Traurig, Brook represented a former executive (the "Executive") in connection with federal civil and criminal charges (the "Executive Matter"), and in connection with a partially related arbitration against the Executive's former employer.

16.     After the Executive was convicted in 2010, the Executive asked Brook to take a leading role in appealing his conviction.

17.     Through mid-2011, attorneys' fees for the Executive Matter had been paid by the Executive's former employer (the "Employer") under a contractual obligation to advance the fees and expenses for the Executive's defense.

18.     The information available to Brook in mid-2011 indicated that the Employer had not always made timely and complete payments. This information also caused Brook to question how readily the Employer would accept a new law firm to handle the appeal, and whether the Employer would impose conditions or limits on its future payments of attorneys' fees, if it continued to pay them at all.

### Brook Speaks to Simon About Joining the Firm

19.     On or about June 10, 2011, a former colleague told Brook about Simon & Partners. Brook was previously unfamiliar with either the Firm or Simon.

20.     On or about June 13, 2011, Brook emailed Simon, describing the Executive Matter and the Executive's desire to find additional counsel with experience in white collar criminal defense.

21.     Simon responded by email, stating, "I would be happy to speak to you to see if I can assist you with this matter."

22.     On or about June 14, 2011, Brook spoke with Simon by phone. Brook said that, as an alternative to opening up his own law practice, he wanted to associate with a new firm that provided long-term partnership prospects. Brook explained that he expected his time would be devoted to the Executive Matter for

the foreseeable future, and that he would be satisfied with deriving his income solely from his work on the Executive Matter.

23.     On or about June 16, 2011, Simon and Brook met at the Firm's offices. Later, the Executive joined the meeting, along with Brian Waller, to discuss the Executive Matter.

24.     After the meeting, Simon extended Brook an offer to be associated with the Firm. Brook asked for specific information about the financial terms, and Simon responded that he would need to get back to him.

25.     On or about June 17, 2011, Brook again met with Simon, who expressed concern about the uncertainty over whether the Employer would pay the bills for the Executive Matter. He also said he was unsure whether there would be work for Brook if and when the Executive Matter slowed down. Simon explained that although he could not provide specifics yet, the financial terms of the offer would involve a much smaller base salary than offered by larger firms because Simon & Partners was a small firm and that its cash flow often varied significantly over time. Simon also stated that, when the Firm collected money, the Firm paid periodic bonuses—as often as every month but typically at least quarterly—based upon lawyers' individual contributions to the Firm.

26.     Simon also promised that, in addition to a salary and potential bonuses, Brook would receive origination credit for bringing in the Executive Matter. Simon agreed that this credit entitled Brook to a percentage of other lawyers' Executive Matter billings; he stated that he did not want to fix the

percentage at that time because he needed more information about the matter to determine a fair percentage. Nonetheless, Simon repeatedly assured Brook that he would pay him fairly and that he and Brook could continue to discuss a fair percentage if Brook disagreed. Simon stated that he always paid his employees "more than fairly" and that his accountant had criticized him for giving his partners and employees too much of the Firm's profits

27.     At the time Brook was speaking with Simon, he had offers on the table from four alternative opportunities. Three of the four opportunities would have involved Brook starting his own practice with support from established law firms.

28.     Brook described his other offers to Simon, who assured Brook that joining the Firm was the best option financially and in the long run. Not only would Brook get a percentage of other lawyers' billings, said Simon, but the Firm offered Brook an opportunity to become a partner in the near future.

29.     Simon also assured Brook that he would seek to involve him significantly in other firm matters besides the Executive Matter, because working with the Firm's other lawyers was important to becoming partner.

30.     Based on the discussions described above, Brook told Simon on June 17, 2011 that the Firm was his top choice, and asked Simon to let him know by June 19 what base salary and title he could offer.

31.     On or about June 19, 2011, Brook drafted an engagement letter between Simon & Partners and the Executive and sent it to Simon by email. In the cover email, Brook wrote, "Also, I'm still available to speak at a time convenient for

you to continue our discussions about my employment arrangements . . . I'm looking forward to hearing your proposal." The parties then postponed their discussion until the next day.

## Brook and Simon Discuss Compensation

32.     On or about June 20, 2011, Simon and Brook met to discuss the terms of Brook's employment. Simon offered a base salary of $150,000 per year, paid biweekly; he described the base salary as "artificially low" because of the Firm's cash flow concerns. He said that he expected Brook would receive periodic bonuses based on revenue generated from the Executive Matter and proportionate to Brook's own billings plus an unspecified percentage of "origination credit" for other attorneys' billings. In addition, Simon said that he would pay discretionary bonuses for Brook's work on other Firm matters, just as he did for everyone else in the Firm.

33.     Simon rejected Brook's request for the title of Of Counsel because, he said, Of Counsel maintain their own, separate practices and do not work with the Firm's Partners and Associates on client matters. Since Brook was seeking to involve the others at the Firm on the Executive Matter, the title would be inappropriate. Simon said that he would be happy to give Brook whatever title he wanted, and even joked that he could be "name partner" for all that he cared, because "the sky is the limit on what you can do at this firm." Simon ultimately suggested the title of Senior Associate.

34.     Brook told Simon that those terms were acceptable to him, but that the amount of his origination credit should be set at the outset and in writing. Simon

responded that he did not think it was in either party's interest to determine the amount of the origination credit at the time, given the uncertainties about the Executive Matter, including the potential difficulties in receiving full and prompt payment from the Employer. Among other things, Simon said that the origination credit "could be 10% or it could be 50%, I just don't know. We'll have to see how things work out." Simon reassured Brook, however, that he would be compensated fairly for "bring[ing] in a lot of money."

35.    In particular, Simon proposed that once the Firm received the first paychecks from the Employer, he would calculate the amount that he thought was fair and distribute it to Brook with his next paycheck; and if Brook then believed that the amount was unfair, he should discuss "fixing" it with Simon because his "door is always open." Simon added that, hypothetically speaking, if the Executive Matter generated only $250,000 in fees, Brook would not likely receive a total salary significantly above $200,000.

36.    Brook then offered a different hypothetical: If the Executive Matter generated over a million dollars in fees, how much would he earn? Simon smiled, nodded, and stated, "If that happens, you are going to be a rich young man." Brook responded, "Sounds good."

37.    Based on these representations and promises by Simon, Brook agreed to join Simon & Partners.

## Brook Begins Working at Simon & Partners

38.     Brook began employment with Simon & Partners on July 13, 2011. Even before his official start date, Brook had already begun working with Simon & Partners on the Executive Matter, and most of Brook's time doing so was billed to the Employer by Simon & Partners.

39.     The first Executive Matter invoice was issued on or about August 5, 2011, covering June 20 through July 19, 2011. It was prepared with substantial input from Brook.

40.     Among other things, Brook personally reviewed and redacted each attorney's time entries to ensure that no privileged information was disclosed to the Employer.

41.     In addition, Brook was asked for his approval before Waller, who handled the administrative aspect of billing, wrote off some of Brook's time.

42.     Although the first invoice had included most of Brook's billable time recorded between June 20 and July 13, he did not receive any base salary or benefits for that period.

43.     On or about July 29, 2011, Brook received his first paycheck from Simon & Partners, in the gross amount of $6,250 for the period from July 16 through July 31, 2011.

44.     Although the Firm did not pay Brook for any of his work before July 16, 2011—including his first three days in the office full-time—Brook did not object at the time because, based on Simon's earlier representations, Brook understood

that his base salary payments constituted periodic draws against his future compensation. Accordingly, Brook believed that the absence of any base salary payments would not affect his total compensation upon the Firm's receipt of payments for work on the Executive Matter.

45.     The second Executive Matter invoice was issued on or about September 9, 2011. As before, Brook had substantial input in reviewing the invoice prior to its submission to the Employer.

46.     In or about mid-September 2011, after the Employer failed to pay the first invoice within 30 days, Brook took the lead role on behalf of Simon & Partners in the collection efforts. Simon told Brook that he was happy to have him collection because Simon was responsible collecting from the Firm's other clients.

47.     In or about late September 2011, the Employer paid Simon & Partners' first two invoices in full.

48.     On September 30, 2011, Simon & Partners paid Brook, in addition to his base salary, a "bonus" equal to approximately 13.67% of the amount collected for the first two invoices.

49.     The September 30 "bonus" was significantly smaller than Brook expected based on his earlier discussions with Simon, especially because Brook had done much of the invoiced work personally and had taken on a bigger role in managing the Executive Matter than the parties had originally anticipated.

50.     After receiving the September 30 paystub, Brook considered immediately leaving Simon & Partners to start his own practice in collaboration with Peed, and taking the Executive Matter with him.

**Brook Raises Additional Concerns About His Compensation**

51.     In or about early October 2011, Brook told Waller about his concerns with his compensation; Waller advised Brook to speak to Simon directly and also told Simon about Brook's concerns.

52.     In or about early October 2011, Brook met with Simon to discuss his compensation. Simon began the conversation by stating that Brook's concerns were "premature" and assured Brook that he would pay him a "much larger" year-end bonus based on the Executive Matter collections. Simon added that if Brook still believed that he should be paid more after receiving the year-end bonus, then they should discuss the issue further at that time.

53.     Simon also reassured Brook that he would pay him fairly and added that his door was "always open" to discuss compensation so that everyone is happy. And he stated that he did not want Brook to discuss compensation issues with the other lawyers, including Waller.

54.     Simon further attempted to explain how he had calculated the "bonus." He said that it was based on a "long-term" outlook, because Brook might at some future date receive more compensation than he had fairly earned; Simon stated that it was best to pay Brook less now to cover that eventuality.

55.     Brook expressed disagreement with Simon's approach, stating that he believed that fair value should be paid for services rendered. Brook also offered to forgo a base salary to address Simon's concern and stated that with that adjustment, there should be no impediment to his being compensated fully and fairly for his work and other contributions. Simon declined Brook's offer to eliminate the base salary.

56.     Simon further stated that he thought that he and Brook had a different understanding, but that Simon could adjust his expected compensation calculations to pay more in line with Brook's stated understanding and preferences. Simon reiterated that Brook should wait until after he received his year-end bonus before worrying about compensation.

57.     Simon also emphasized again that Brook should think long-term, and specifically held out the prospect of partnership in the near future as a reason for Brook to accept lower compensation in the short-term. Partnership, said Simon, meant "sharing the wealth" generated by the entire firm, which would be valuable long after the Executive Matter ended.

58.     Brook believed Simon's promises and assurances during the early October meeting and was particularly encouraged by Simon's stated willingness to consider Brook for partnership in the near future. In reliance on Simon's statements, Brook opted to remain at Simon & Partners.

59.     The Employer paid the third Simon & Partners invoice in or about mid-October 2011.

60.     At the end of October 2011, Brook received a second "bonus" payment, in an amount significantly larger than the previous payment, constituting approximately 51.4% of the amount paid by the Employer in the month of October.

61.     No payment was received by Simon & Partners from the Employer in the month of November. No "bonus" payments were made to Brook in the month of November.

62.     Brook received additional compensation on his final payroll deposit for 2011. Unlike previous payments, the amount was not specified as a "bonus." No explanation for the amount was offered by Simon or anyone else at Simon & Partners.

63.     Other Firm lawyers told Brook that year-end bonuses were typically not included in payroll deposits or listed on payroll statements, but rather were paid by check. Yet Brook received no check from Simon & Partners either before or after year-end 2011.

64.     In or about late January 2012, Brook learned that neither Waller nor Murphy were actual equity partners in Simon & Partners.

65.     As of that time, the only equity partner in Simon & Partners was Simon himself.

66.     On or about February 6, 2012, Brook met with Simon. Simon stated that he wanted Brook to stop receiving any base salary and instead to receive one hundred percent of what he billed on the Executive Matter going forward.

67.     Brook stated that he would agree only if the arrangement was made retroactive, at least back to October when Brook had proposed a similar arrangement, so that he would be compensated fairly for his work to date, including several hundred hours spent working on the Executive's appellate brief in the preceding few months. Simon stated that he wanted to think about that proposal. Brook also pointed out that Simon's proposal did not account for the guarantee that Brook receive origination credit for work performed by others.

68.     Brook expressed skepticism about long-term partnership prospects, asking Simon whether he still believed that partnership was feasible in the near term. Simon said that partnership was still a possibility, but admitted that he was talking about giving Brook only a title, and not an actual partnership interest in the Firm.

69.     After the meeting, Brook drafted a proposed written agreement as a compromise to avoid further disputes and uncertainty. Simon rejected Brook's proposal without reading past the first few lines: He walked into Brook's office, threw the document at Brook, and yelled, "If what I'm offering isn't good enough, you and [the Executive] can go elsewhere."

**The Firm Secretly Reclassifies Brook as an Independent Contractor**

70.     At some point in the following days, and without further discussion, Simon eliminated Brook's base salary.

71.     When Brook noticed this change on his paystub, he did not know whether Simon had accepted Brook's counteroffer that the proposed compensation

terms be retroactive to ensure that Brook received at least 100% of his own hours billed and paid, or if instead Simon had decided to act unilaterally without Brook's consent and even though Brook continued to have an office at Simon & Partners and to receive benefits, including health insurance.

72.     Brook chose to remain associated with Simon & Partners after the February 6 meeting because of the likelihood that he would still be able to receive substantial payments if and when the Employer paid the bills for the last several weeks of work on the Executive's appellate brief.

73.     Unbeknownst to Brook at the time, Simon had also reclassified Brook as an independent contractor rather than an employee.

74.     Also, in April 2012, the Employer paid one or more of the outstanding bills for work on the Executive Matter.

75.     In April 2012, Simon & Partners gave Brook a check in the amount of $105,254.64, without any explanation for how this amount was calculated.

76.     The Firm reported the April 2012 payment on a 1099-MISC as a payment to an independent contractor, rather than on a W-2 as a payment to an employee.

77.     Brook had performed the work associated with the April 2012 payment while he was still treated as an employee of Simon & Partners.

78.     Accordingly, the April 2012 payment should have been paid to him as an employee rather than as an independent contractor.

79.     Simon & Partners' misclassification of the April 2012 payment caused Brook to incur additional tax liabilities, including self-employment taxes, while enabling Simon & Partners to reduce its own liabilities, including its payroll taxes and unemployment insurance premiums.

80.     Brook did not learn that he had been reclassified until May 22, 2012, when his mortgage broker informed him that Simon had refused to verify his employment. Brook confronted Simon about this issue on the same date, and explained why Simon's classification of Brook as an independent contractor was incorrect. Among other reasons, that the Firm provided office space to Brook without charge suggested that the Firm was treating Brook as an employee.

81.     On May 23, 2012, Simon instructed Brook to vacate his office by the end of the day. He said that Brook could continue to work with the Firm on the Executive Matter, but that Brook would no longer manage the case and that Simon would do so instead. Later that day, Simon repeated this instruction by email and stated that Simon would make "all staffing decisions with respect to the reply [brief]" that would be filed in June.

**Brook Leaves the Firm**

82.     On May 25, 2012, Brook conveyed to Simon a written Notice of Termination of Representation from the Executive. In this notice, the Executive asked Brook to inform Simon that he wanted all of his related case matters transferred to Brook and that Simon should cooperate to the fullest extent with

Brook's departure to ensure that there be no prejudice to his case as a result of the separation.

83.    On June 11, 2012, Murphy told Brook by phone that the Employer had paid over $500,000 in outstanding bills since Brook's departed. Murphy offered Brook less than 15% of the amount received if Brook signed a full release. Brook rejected the offer.

84.    Brook has continued to represent the Executive since leaving the Firm.

### Peed's Agreement with Simon

85.    Before joining the Firm, Brook had asked Simon whether there would be any problem with Brook working with Peed on a *pro bono* Somali piracy matter pending in the District of Columbia if Brook were to join the Firm. Simon said that there would be no problem with that, and that Brook would have the Firm's support on the *pro bono* matter. Simon also mentioned his experience working as an Assistant U.S. Attorney in D.C. as a potential benefit to negotiating a plea deal.

86.    In or about early September 2011, Brook asked Simon about the possibility of engaging Matthew Peed to assist with the Executive Matter. Simon indicated that the was open to it because the rest of the Firm was very busy and because Brook recommended Peed so highly.

87.    In or about September 2011, Peed met Simon in Washington, DC during a meeting with the prosecutors in the *pro bono* piracy case. Brook also attended this meeting.

88.    After the meeting with the prosecutors, Simon and Peed discussed the potential terms for working together not only on the Executive Matter, but also on the *pro bono* piracy case and potentially on other business.

89.    Simon explained that he would like to have another lawyer in Washington, DC to help him pitch business there. He said that he believed Peed could help to expand Simon & Partners' presence in the area.

90.    Simon expressed concern as to whether the Employer would pay Peed's $450 hourly rate, particularly for time spent "getting up to speed." Simon said that he did not expect he would even try to bill the Employer for such time.

91.    Simon stated his concern that the Employer was behind in paying its bills, but said that he believed that Peed "should be paid for every hour worked regardless."

92.    Simon said that Peed "should not have to wait for [the Employer] to pay its bills in order to receive compensation."

93.    Based on the foregoing, Simon presented the following offer:

   a.   Simon & Partners would pay Peed $125.00 per hour for his time spent on the case until such time as it was determined whether the Employer would pay Peed's time in full.

   b.   The hourly rate was to be paid to Peed promptly after submission of time sheets to Simon & Partners and was not contingent upon receiving payment from the Employer.

    c.   Simon would inform Peed as soon as he knew whether the Employer objected to Peed's billing rate and that the parties would, at that time, revisit the appropriate hourly rate to pay Peed, with the mutual understanding that the hourly rate would increase significantly if the Employer agreed to pay Peed's full hourly rate.

    d.   Simon offered to provide Peed with health insurance.

94.    Relying upon Simon's representation that Simon would be paying him "out of pocket" and that his compensation would be increased when the status of the Employer's payments was clarified, Peed accepted the terms of Simon's offer except for the offer of health insurance, which Peed did not need.

95.    Peed began working on the Executive Matter on September 22, 2011.

96.    Although Simon had said he would not invoice the Employer for Peed's "getting up to speed time," he in fact did so, ultimately writing off only 0.4 hours of time recorded by Peed during his first month from the invoice submitted to the Employer.

97.    On November 1, 2011, Brook learned that Simon had not written off Peed's time as he had told Peed he would do. After Brook conveyed concern about that to Simon, Brook's access to the Firm's billing records was cut off. When Brook asked Waller about that, Waller said that it had been a coincidence, and that the Firm had long been planning to improve security.

98.    Peed submitted monthly time sheets beginning in October 2011. Although Mr. Simon indicated in October 2011 and again in November 2011 that he

needed to "issue a check to Mr. Peed," it was not until December 2011—two months after submitting his initial time sheet—that Peed received his first check from S&P in the amount of $4,787.50. No explanation or breakdown was provided for the amount that was disbursed to Peed.

99.    Upon information and belief, the invoice reflecting Peed's initial work on the Executive Matter was paid in full by the Employer in December 2011.

100.    Accordingly, even though Simon had promised Peed that his receipt of hourly wages for working on the Executive Matter would not be contingent on receiving payment form the Employer, Simon had delayed making any payment to Peed until after a payment was received.

101.    Simon failed to disclose the fact of the December payment by the Employer to Peed.

102.    Simon concealed the December payment by the Employer from both Brook and Peed. Among other things, Simon characterized the additional payment on Brook's final paystub of 2011 differently than he had the earlier "bonus" payments that resulted from payments being received from the Employer. As a result, neither Brook nor Peed even suspected that there had been a payment made by the Employer in December 2011 until many months later.

103.    By failing to disclose the December payment, Simon also helped to conceal the fact that he had delayed paying Peed until after he received payment from the Employer, in express contravention of the terms agreed upon.

104.    In addition, Simon did not disclose his intention to classify Peed as an independent contractor rather than an employee. On the contrary, by offering health insurance and indicating a desire to work on cases together besides the Executive Matter, Simon had led Peed to believe that he would be classified as an employee. As a result of Simon's misleading him, Peed ended up having to pay unexpected self-employment taxes on the $125 per hour that he was paid.

105.    Had Simon disclosed the December payment to Peed; the fact that Peed's recorded hours were paid at his full hourly billing rate; and the fact that Simon never went out-of-pocket to pay Peed before receiving payment from the Employer, Peed would not have agreed to continue working at $125 per hour.

106.    Despite continuing to submit monthly time sheets submitting time sheets each month from October 2011 through February 2012, Peed did not receive additional compensation from Simon until April 2012. Although the April 2012 payment ($12,400.00) was apparently based on services performed through December 19, 2011, no explanation or breakdown was provided for the amount that was disbursed to Peed.

107.    Upon receiving the payment, Peed emailed Simon on April 20, 2012 to ask (1) "what months it covers"; (2) "whether expenses are included"; and (3) whether the Employer "g[a]ve you any problems with my time?"  Simon responded the same day, stating, "I am not sure.  I have been out of the office today.  I will find out the answers to your questions."

108.   On April 23, 2012, Peed and Simon met for lunch in the Washington,

D.C. office of S&P.  During lunch, Peed again inquired as to whether Duane Reade

had paid Peed's initial bill at the full hourly rate of $450.00 per hour.  Simon

confirmed that all bills had been paid by Duane Reade at Peed's full hourly rate.

109.   Peed was stunned by Simon's admission.  Shortly thereafter, Peed sent

an email to Simon reminding him of the representations that Simon had made at

their initial meeting and requesting that the issue of his compensation be revisited.

Peed also noted in the email that the April 2012 payment appeared to only cover

time through December 19, 2011, leaving time from December 20, 2011 to February

19, 2012 and $1,193 in expenses unpaid.

110.   Simon responded the next day, stating that he would "look at the

numbers and get back to" Peed.  However, despite repeated attempts by Peed to

schedule a conference to finalize his compensation with S&P, to discuss unpaid

amounts, and to obtain an accounting for the amounts that had already been paid,

Simon never followed-up with Peed as he had promised. Instead, without ever

communicating again with Peed, Simon removed Peed's biography from the firm's

website without notice.

111.   In June 2012, Peed received a check from S&P in the amount of

$16,337.50, which reflects a rate of compensation of $125.00 per hour for the 130.7

hours billed by Mr. Peed between December 19, 2011 and February 3, 2012.  The

check was accompanied by a letter apologizing for the delay in repaying Peed's

expenses, stating that Simon was under the mistaken belief that Peed's expenses

had been repaid.  The letter contained no apology for the extreme delay in the payment of fees, however.

112.    In light of Simon's above-stated conduct, it is clear that Simon misrepresented his intentions to Peed during the September 2011 meeting in Washington, DC. Specifically:

    a.  Simon never intended to write off any significant amount of time, but rather used that claim as a bargaining chip to convince Peed to accept a lower payment rate.

    b.  Simon never intended to pay Peed out-of-pocket and before receiving payment from the Employer, but rather used the false appearance of him assuming the risk of non-payment as another bargaining chip to convince Peed to accept a lower payment rate.

    c.  Simon never intended to inform Peed of payments received from the Employer, but rather intended to keep Peed in the dark and string Peed along in order to take advantage of Peed's trust in Simon's good faith and to obtain Peed's services for as long as possible at the low rate of $125 per hour, while pocketing the additional $325 per hour paid by the Employer.

    d.  Simon never intended to renegotiate Peed's payment rate.

113.    At a minimum, by failing to perform his promise to disclose the first Employer payment of Peed's time to Peed, Simon concealed his material breach of the agreement and thus fraudulently induced Peed's continued performance under

the agreement by denying Peed the opportunity to terminate that agreement based on Simon's material breach.

114.   By the time the June 2012 payment by the Employer was made on invoices for December 20, 2011 through April 19, 2011, Peed had learned about Simon's material breach of the agreement described above.

115.   Accordingly, when Waller sent Peed a check as supposed "final payment in full for the time he worked on the [Executive] appeal (through February 3, 2012)," Peed refused to deposit.

116.   In the absence of any existing agreement between them as a result of Simon's material breach, which he concealed, Peed is entitled to the full and fair value of the services he rendered, which is $450 per hour, as billed to the Employer.

### Contracts with Simon & Partners Are Voidable

117.   Because New York does not allow formation of a partnership without at least two partners, Simon & Partners is not a valid LLP.

118.   Since the legal entity that purportedly entered into contracts with Plaintiffs was not validly formed at the time of the purported contracts, those contracts are voidable by Plaintiffs.

119.   To the extent that valid contracts otherwise existed and were not fraudulently induced Plaintiffs hereby express their desire to void the contracts with Simon & Partners and obtain compensation for the full value of their services *in quantum meruit*, and to obtain such other and further equitable relief as the Court deems just.

## Veil Piercing and Alter Ego

120.    Because Simon & Partners had only one equity partner, it was not a valid limited liability partnership under New York law. Accordingly, Simon is personally liable for all of the Firm's obligations, including the unfulfilled financial obligations to Plaintiffs for compensation *in quantum meruit* or, alternatively, for contract damages.

121.    In addition, New York Partnership Law § 26(c) imposes liability on Simon for his direct misconduct and for his exercise of direct supervision and control over the misconduct that caused Plaintiffs' damages.

122.    On information and belief, in or about late 2012, Simon withdrew funds generated by work performed by Plaintiffs and designated them for payment to Plaintiffs so that he could renovate his apartment. This fraudulent conveyance warrants piercing the corporate veil, to the extent that any exists.

## COUNT ONE

### Unjust Enrichment

123.    Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

124.    No contract was formed between Brook and Defendants. As alleged in detail above, there was no meeting of the minds between the parties regarding Brook's compensation for services rendered while associated with Simon & Partners. At best, there was an invalid "agreement to agree," or an agreement too indefinite on an essential term to be enforceable.

125.    In addition, to the extent that a contract did exist between Plaintiffs and Simon & Partners, it is voidable because Simon & Partners was an invalid entity at the time because Simon in fact had no partners.

126.    Defendants benefitted as a direct and proximate result of the services performed by Plaintiffs, including origination of the Executive Matter by Brook.

127.    The benefit conferred on Defendants was at Plaintiffs' expense because had Plaintiffs provided the same services elsewhere, they would have received significantly more compensation, including at a minimum their full hourly billing rates plus, in the case of Brook, origination credit for work performed by other attorneys.

128.    If Simon is not required to provide further compensation to Plaintiffs, he will effectively have earned in excess of $5,000 per hour for his work on the Executive Matter—a case which he neither originated nor managed, and in which the client asked the Simon not be substantially involved due to misconduct that will be detailed in the trial of this matter.

129.    Equity and good conscience require restitution to Plaintiffs of the benefits received by Defendants at Plaintiffs' expense by, among other things, requiring Defendants to compensate Plaintiffs the full and fair value of the services performed.

## COUNT TWO

### *Quantum Meruit*

130.    Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

131.    As alleged above, no contract was formed between Brook and Defendants.

132.    To the extent that contracts were formed with Simon & Partners, Plaintiffs elect to void those contracts based on the fact that Simon & Partners was not a valid legal entity at the time.

133.    As to Peed, Defendants materially breached the contract in December 2011, or, alternatively, failed to complete a condition of the contract's continuation by failing to disclose the December 2011 payment by the Employer. Accordingly, Peed is not bound by the contractual compensation rate for the period of work performed after the date of Defendants' breach.

134.    Plaintiffs performed services for Defendants in good faith.

135.    Defendants accepted the services rendered by Plaintiffs and, indeed, induced Plaintiffs to continue to provide those services longer than they otherwise would have had Defendants not misrepresented and concealed material facts.

136.    Plaintiffs expected to be compensated for the full and fair value of the services they rendered. Among other reasons, as alleged above, Simon expressly promised as much to Brook, and repeatedly. And Peed was led to understand that

he was being paid less than his full hourly rate only because Simon was assuming

the risks of non-payment, which turned out to be untrue.

137.   Accordingly, Plaintiffs are entitled to the reasonable value of the

services they rendered.

## COUNT THREE

### Fraud

138.   Plaintiffs repeat the allegations of the preceding paragraphs as though

fully set forth herein.

139.   Defendants contend that a contract was formed with Brook that

afforded Simon sole, complete, and unfettered discretion to determine the amount of

"bonuses" paid to Brook.

140.   To the extent that the Court finds that a contract existed anywhere

along the lines of what Defendants contend was agreed upon, the Court should

permit Brook to rescind the contract based on its fraudulent inducement.

141.   As alleged in detail above, Simon made numerous material

representations to Brook to induce him to choose Simon & Partners over other

options. The most important distinguishing feature of the Simon & Partners offer

was the prospect of partnership in the future.

142.   Even though Simon was clearly the managing partner of the Firm,

Brook did not know and had no reason to suspect that Simon was actually the only

partner in the Firm. The purported partnership was a sham.

143.   Simon knew or believed that the representations being made about

partnership prospects were false because, in fact, there was no partnership to join.

144.   Simon caused the misrepresentations to be made with the intention that Brook rely on them by deciding to join Simon & Partners instead of another option that would have provided more financial certainty.

145.   Brook reasonably relied on Simon's representations that partnership was a prospect in the future if he joined the Firm because Simon repeatedly said that he had "partners"; the name of the Firm was "Simon *& Partners*"; and the Firm was practicing law as a limited liability partnership.

146.   As a direct, proximate and foreseeable result of his reliance on Simon's misrepresentations, Brook chose to join Simon & Partners over other opportunities available in June 2011.

147.   Both before and after joining the Firm, Simon repeatedly misrepresented his then-existing intention to pay Brook compensation that was fair (particularly in light of the non-existence of any real partnership prospect). Brook relied on Simon's representations about his compensation practices and his express promise to reach a fair agreement on the percentage once the uncertainties of the Executive Matter billing were resolved. Brook reasonably relied on these representations both in joining the Firm in June 2011 and, later, in October 2011, when he decided to remain there longer.

148.   But for the fraudulent inducement by Simon, Brook would never have associated with Simon & Partners and/or would have left Simon & Partners in October 2011, before completing the bulk of the work on the Executive Matter.

149.    Brook suffered significant damages as a result of fraudulent misrepresentations and omissions by Simon.

150.    Furthermore, to the extent that a contract existed at all, Simon's fraudulent inducement of Brook's agreement to work at the Firm warrants rescission of that contract. *See Sokolow, Dunaud, Mercadier & Carraras, LLP v. Lacher*, 299 A.D.2d 65 (1st Dep't 2002).

151.    Simon's conduct was of a sufficiently reprehensible nature as to warrant the imposition of substantial punitive damages, particularly because of his role as an officer of the court and management of a law firm practicing in multiple jurisdictions.

152.    As to the contract with Peed, Simon misrepresented his then-existing intentions in order to convince Peed to accept a lower billing rate than he otherwise would have agreed upon.

153.    Peed justifiably relied on Simon's representations under the circumstances because he had no reason to believe them to be untrue.

154.    Peed was harmed by Simon's representations because he ended up agreeing to a much lower hourly payment rate than he otherwise would have had he known that Simon did not actually intend to assume the risk of non-payment by the Employer.

155.    Peed has suffered damages in at least the amount of the difference between the rate he agreed to receive and the one that would have been reasonably appropriate had the true facts been disclosed at the time of the negotiation.

156.    Peed's agreement to the contract was fraudulently induced, and therefore in addition to damages, Peed should be permitted to rescind the contract.

157.    To the extent that rescission in full is not permitted, it should be rescinded as of the date in December when Simon received payment on Peed's time on the Executive Matter, because Simon failed to disclose and fraudulently concealed this fact from Peed in order to avoid renegotiating Peed's rate at that time, as he had promised to do.

## COUNT FOUR

## Breach of Contract (In the Alternative)

158.    Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth herein.

159.    In the alternative, to the extent that the contract between Peed and the Firm is not void or voidable or subject to rescission in whole or in part, a valid binding and enforceable oral agreement existed between Peed and Defendants.

160.    Pursuant to their oral agreement, Defendants were obligated to inform Peed if and when the Employer paid fees for his time because, at that time, the contract would automatically terminate and need to be renegotiated.

161.    Pursuant to their oral agreement, Defendants were obligated to pay Peed for his time irrespective of when or whether the Employer paid Simon.

162.    Peed performed all of his obligations pursuant to the oral agreement.

163.    Defendants breached the oral agreement by failing to pay Peed before receiving payment from the Employer and by concealing the fact of the Employer's payment from Peed.

164.    Defendants breached the express terms of the contract as Peed understood them; and to the extent that there is any dispute about the terms of the contract, Defendants' conduct nonetheless breached the contract's implied covenant of good faith and fair dealing.

165.    To the extent that the December payment was not an event that terminated the contract, Simon's concealment of that fact constituted a material breach of the contract and, as such, would have allowed Peed to terminate the contract.

166.    Peed has suffered damages as a result of Defendants' breach and is entitled to compensation therefore.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against Defendants as follows:

A.    Rescission or voiding of the contracts, if any existed;

B.    Compensation *in quantum meruit* for the full and fair value of the legal services rendered by Plaintiffs, which is presumptively their full hourly billing rate, and thus not less than approximately $425,000 to Brook and $87,075 to Peed;

C.    Compensation *in quantum meruit* for the full and fair value of originating and managing the Executive Matter and thereby generating billable work for other lawyers at the Firm, in an amount to be determined at trial;

D.    Restitution and disgorgement to prevent unjust enrichment;

E.    Compensatory damages in an amount to be determined at trial;

F.    Prejudgment interest on all compensatory damages;

G.    Punitive damages;

H.    Attorneys' fees and costs of suit;

I.    Such further relief as the Court deems just an equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.


Dated:  June 19, 2017


/s Timothy R. Clinton
Timothy R. Clinton
CLINTON BROOK & PEED
1455 Pennsylvania Ave. NW, Suite 400
Washington, DC  20004
Tel: (202) 621-1828
Fax: (202) 204-6320
tim@clintonbrook.com